Hi, Mr. Frederick. We're pleased to hear from you, sir. Thank you, Judge Wilkinson, and may it please the Court, I'm David Frederick for GenBioPro. The issue in this case is whether West Virginia can interfere with the balance between access and safety Congress entrusted to the FDA for Mifepristone. The answer is no. In 2007, when Congress enacted the FDAAA, it knew Mifepristone was on a list of 16 drugs that had been approved with special post-marketing restrictions by the FDA under Subpart H. Let me just get it straight. You're bringing a preemption challenge. You're not bringing a silent commerce clause challenge or anything. That's right. The issue solely is preemption. The issue before us is strictly focused on preemption. That's correct. And the argument here is that in 2007, when Congress enacted this act, it was the first time Congress had entrusted the FDA with post-marketing restrictions and regulations for surveillance and other special uses of the drug under highly specialized conditions. And what Congress did in 355-1F, which is set forth in the addendum to our brief starting at page 12, is a series of factors the FDA was required to balance in ensuring access to the drugs that were on this list while preserving effects that would have effects on the healthcare delivery system, on rural areas and other special needs patients. And that balancing is what West Virginia is seeking to interfere with here. Because what West Virginia says is that Mifepristone can be taken only if there's a medical emergency or there's a non-viable embryo. The FDA, however, did not make the balance on that particular set of features. What the FDA said was that if the doctors, the patients, the pharmacies, the provider, fulfilled certification requirements, a woman could take Mifepristone within the 10-week period that it had been authorized and approved for use. Are you suggesting that any time the FDA is dealing with a high-risk drug and regulates by virtue of REMS, that that is automatically preemptive? I think under... But that's a very broad concept, isn't it? Well, let me pack it for you this way, Judge Wilkinson. Under our field preemption theory, those drugs that are subject to special safe use elements, there are approximately 70 out of 20,000 on the market. Those are subject to highly specialized rules, and we think it fits within this court and Supreme Court precedent regarding field preemption. But if you were not to go that far, you would still find, we believe, conflict preemption principles to apply, because the balance and the factors that the FDA considered override... I'll come back, because the concern I have is the genesis of your argument, of your preemption argument, is that the FDA has, pursuant to its REMS protocol, set down a set of conditions for the use of a particular drug. But if we think that that sort of REMS regulation, all of which is likely to be somewhat detailed, is preemptive, doesn't that cut the states out of the picture almost completely? And doesn't that use... And it says, I thought that the REMS protocols were meant to be a floor and not a ceiling. Have you cut the states out of the picture to the extent that the states are no longer able to pass additional safety regulations in furtherance of the safety and health of their own citizens? Doesn't your view of preemption preclude the states with a wide variety of drugs? Not just this one, but a wide variety of drugs. Doesn't it preclude the states from adding additional safety measures on top of the REMS to further the health and safety of their own citizens? I mean, I think the theory that's propounded here puts the states, could potentially put the states in handcuffs as far as health and safety of their citizens is concerned. Is there something unique about this REMS that doesn't apply to any other REMS? Well, there are only a handful of drugs that are subject to these specialized rules, Judge Wilkinson. And I do want to emphasize this point, which is crucial. The other side has no case or history of any state at any time restricting access to an FDA-approved medication. None. You can ask, there is no case on this. The only case, Massachusetts tried to do this once, was held preempted by the district court, no appeal taken. And so against a history where FDA has had superintendents over medications, when Congress says under this 2007 law, we need you to impose additional rules that will ensure access with balancing safety interests that affect the healthcare delivery system, and rural areas, and special needs patients. Follow up to Judge Wilkinson's question, isn't the issue of safety, health, and medicine a field traditionally left to the states? Not in all circumstances. So for instance, in the Arizona case, the Supreme Court held that safety restrictions that affected unauthorized, undocumented persons from working were not subject to state rules in GAID. The Supreme Court held that specialized rules regarding hazardous material workers were subject to a sublimated subfield preemption theory, if you will. So just calling something safety or health has not ever been deemed to be exclusive. What are you saying to me? Are you saying that the interest in the welfare of an unborn child is not a safety interest or a health interest that the states can assert pursuant to their traditional police powers? What I'm saying is that Congress... I think the answer is no. Congress entrusted the balancing on these factors to the FDA. So the FDA set forth rules that said that this drug can only be taken within the first 10 weeks of a gestational period of an embryo. Well, if Congress entrusted the balancing to the FDA, what about the savings clause here? It's been very unusual that we would find a statute to be preemptive with a savings clause. And it appears to be a pretty... not a weak savings clause, but it seems a strong savings clause. Nothing in the amendments made by this act shall be construed as invalidating any provisions of state law, which would be valid in the absence of such amendments, unless there is a direct and positive conflict. I've read savings clauses and, you know, in the whole gallery of savings clauses, this seems to be a pretty strong expression. And in the face of that, are we to find that there is... Congress intended to preempt, because when Congress intends to preempt, it doesn't enact that kind of safety clause. The answer is yes, Your Honor. The 1962 savings clause only applied to the 1962 act by the plain language of the savings clause. Number two, Congress could have enacted a savings clause in the 2007 act. It didn't do so. The 2007 act imposes many more restrictions and powers on the FDA over post-marketing surveillance than the 1962 act. And the Supreme Court, in the Locke case, took a savings clause that had been enacted in the Oil Pollution Act and said it didn't apply, even though that act was a subset of the Port and Waterway Safety Act, where the court found both field and conflict preemption. You know, to be honest with you, some of the Supreme Court cases point in different directions. Well, and I appreciate that, and that's why we have argued both field and conflict preemption, because the line is sometimes a little bit fuzzy between which applies. But what is very clear is that for cases like this one, where the state is interfering with the judgments made by the federal government, there is at least obstacle preemption. One thing that occurs to me, because I'm a member of an inferior federal court, and I don't, you know, what I think of the law or what I don't think of the law is totally unimportant. It's not relevant whether I like it or whether I don't. But what is relevant to me is that I want to do my best to follow the decisions of the Supreme Court, and you have the recent Dobbs case, which engenders very heartfelt reactions on both sides. But the gravamen of Dobbs was that the question, a question such as this, should be left to the states. And how do we square up with the Supreme Court if closely on the heels of Dobbs we say, no, we're taking it entirely away from the states and making it completely a federal issue? And so I really worry about just a kind of being in a sort of a semi-rogue position vis-à-vis the Supreme Court. Do you see my concern? Absolutely, Judge Wilkinson. Let me try to reassure you, and if I could take a moment to make a couple of points that are along this line. Number one, Dobbs in its footnotes said the issue should be returned to, quote, elected representatives. Elected representatives in Congress enacted the 2007 Act. Number two, Dobbs concerned an individual right. Our case concerns an FDA-approved medication where there is a clash between the balancing that the states are seeking to impose and what the federal government chose to impose. That is a classic preemption question. Let's take a look at the inverse, and when I say the inverse, suppose there was a drug that the federal government tried to regulate for whatever reason. And let's assume that in West Virginia, I'm going to use that as an example, this drug was proven to be very, very good for people who suffer from black lung disease, which is prevalent in West Virginia. And the legislature in West Virginia said even though we are concerned about the federal mandates and the suggestions of the federal scheme, because this is good for our citizens, because we have a high level of these types of situations, we're going to make this type of drug available for our citizens. What would be wrong with that? Well, the restrictions have to dovetail with what the state is seeking to do. That is the supremacy clause question. Is there a clash, an impact between what the states are requiring and what the federal government has set forth? And so, Judge Alston, I can't answer your question entirely satisfactorily, because it involves a lot of facts. But let's suppose that we understood a federal regime and the specific rules that it imposed for this black lung drug. The way you would analyze that question is you would compare what is the state's regulations or rules and permission structure, and does that clash with what the federal government is saying. So the fact that it is inverse, where the state is being more permissive than the federal government, may or may not lead to a conflict preemption problem. And whether or not there's a field preemption problem would depend on whether this black lung drug was subject to the specialized rules under the REMS with safe use elements. And so absent knowing more about the facts there, I can concede that there might be some circumstances in which this black lung drug would be perfectly acceptable. But for the existence of federal rules on that particular topic. I see that my time has expired, but I also see that you have a lot of questions, and I'm happy to answer your questions, Your Honors. First of all, I think I've taken up your time a good bit of it, and so I'm going to give you some extra time, because you deserve that. And I also want to make sure that my fine colleague here has a chance to ask you questions. I do have a question about the restrictions from West Virginia. The counseling restriction, which is definitely in conflict with what the FDA has said regarding whether it's one pill or two pills, and you can start, and then you can stop. I mean, isn't that exactly what Congress does not want to happen under the federal rules? This uniformity of regulation of this drug? Correct. That is absolutely the fact that those are conflict preempted by the FDA's contrary judgments. Now, those rules are not part of the UCPA. So only if you were to find that the restrictions by the UCPA run afoul of the supremacy clause would you then consider the counseling, the informed consent, those provisions, which are at the back of our argument, but which we did challenge in the district court. As inconsistent with normal conflict preemption principles. I want to point out that one of the other features of this is that Congress enforced a periodic evaluation process on the FDA to ensure that the rules that was enacting for these REMS with safe use elements would be periodically evaluated. If the other side's position is correct, every state and territory and the District of Columbia has a safe use element. If the District of Columbia could enact its own regime, it would be impossible for the FDA to do the periodic evaluation that Congress mandated in 355.-1. And I also want to point out that it is a truism here in this statute that what Congress told the FDA was to take into account the health care delivery system. So when cities like Baltimore talk about all the West Virginians that have to come to get health care in Baltimore, that is not true. That is exactly the kind of problem that Congress entrusted the FDA to determine so that there would be appropriate access to this medication, balancing the effects on rural areas and the health care delivery system. Follow up on Judge Benjamin's question, you only get there if the preemption issue is decided in your favor. As to the overall restriction, that is correct. If you conclude with us that the restrictions on the medical emergencies and the non-viable embryos are inconsistent with the federal scheme, then you would then approach the other provisions that preceded the UCPA. Judge Wilkinson, can I ask one quick question on standing because you haven't had a chance to address that? Yes. I have read your brief and I understand your position on standing, but state in open court here what your basis is for standing and we all know what the general principles are, economic or otherwise. Tell me your basis for suggesting that GenPro actually has standing in this case. Well, we sold 850,000 units as of the time we filed the complaint. That is paragraph 3. We allege that West Virginia constricts our ability to sell. That is complaint paragraph 74. We allege that Mifepristone has increased sales over time. That is paragraph 76. It was an anticipatory loss. And I represented, and this is at JA 127, that GenBioPro had sold Mifepristone in West Virginia in the past. We don't read this Court's cases, Maryland shall issue, the Seventh Circuit case of Izell and the Tenth Circuit case of 303 Creative as requiring past sales. And of course, if that were the rule, it would restrict any newcomer into a market from being able to have standing to challenge the illegality of a statute. But suffice it to say, we have alleged an economic injury and we have satisfied the requisites of third party standing on behalf of the purchasers and users of our product to be able to challenge the unenforceability of the state statute here. Thank you. In your previous response to a question, you said you evinced a great concern that each state would enact its own regime. But isn't that part and parcel of what goes along with our federal system, that states can take a different approach? To difficult questions in the interest of exercising its protection of their citizens. I mean, the fact that states may come up with different approaches, that's, why isn't that something that's just inherent in the way that dual sovereignty is meant to operate? Well, Judge, I will quote back to you your decision in the PPL Energy case where you said... My what? Your decision in PPL Energy where your opinion for the court made clear that it is a question of congressional intent and that congressional intent is the touchstone of every preemption question, which is why I started with the text of the 2007 Act and we put it in our addendum to our brief. I started with the text with the savings clause and I want to ask you another question about congressional intent, which you are absolutely right to say is important here. I think that the Supreme Court is putting an emphasis on clarity and the expression of all law, whether it be Congress or whether it be administrative regulations or whatever. And given the savings clause, it is more difficult for me to see a preemptive intention on the part of Congress. But given the fact that clarity is important, where in the statute or where in the regulations does Congress mandate access to this particular clause? Where in the regulations does Congress mandate access to this particular medication? 355-1F, I will quote it. It says, providing safe access for patients to drugs with known serious risks that would otherwise be unavailable. The very provision under F, and this is addendum 12 to our brief, makes clear that what Congress was seeking to do was to have the FDA entrusted with balancing how much access was available to patients with known serious risks. With the restrictions that would affect the ability of a patient to have access to that particular drug. That is a question that... I'm not sure that Congress was undertaking... Number one, the question is whether that balance should be undertaken by Congress or the states. The question is, if there is a balance to be struck, did Dobbs intend for the states to be part of striking that balance? Two points. Number one, the statute says the secretary, and we're talking about the secretary of health and human services under F1. And number two, Dobbs in revisiting Roe versus Wade, Roe versus Wade was decided at a time when there was no FDA approved medication to terminate a pregnancy. And so surgical abortion was the predominant, if not exclusive, means of terminating a pregnancy. At the time of Roe, so when Dobbs is overruling Roe, it doesn't speak to the statutory question that we have raised here. Why isn't the language that you read me, and that you pointed to, do we need to interpret that as some mandate that access be afforded? Or is it fair to say that the statutory language means when and if it's used, it should be used according to the safety conditions? But as a predicate of that, it would... The safety conditions precede... Move forward on the assumption that the... Not that there's a mandatory, not that there's mandatory access, but that if access is achieved, here are the conditions. And isn't that all that Congress is saying here, not remandate access, but if access is afforded, here are the conditions? No, what Congress is saying is that we're entrusting the secretary through the FDA to make those determinations based on safety, science, access, effects on the healthcare delivery system, provision to people in rural areas. It is a classic balancing question, Judge Wilkinson, of the type your decisions for this court have rendered a number of times in finding preemption where the state is seeking to second guess what a federal agency is entrusted with Congress. The state of Washington, for instance, in Locke, couldn't decide to allow higher restrictions on oil tankers coming into Puget Sound simply because of its deeply held belief that those were necessary to prevent an oil spill. The Supreme Court said that's preempted. I'm a big fan of balancing, but doesn't this tip the balance dramatically against the states? Judge Wilkinson, as I understand it, the presumption, if you take the Supreme Court's case law as a whole, the presumption is against preemption. There is a presumption against preemption because it would destroy the balance between the supremacy clause and dual sovereignty. No, not where there is a federal activity that has been exclusively federal for over a century. The question about the presumption against preemption only applies when there is an historic practice of the states that is at issue. That's not true here. As I open this argument, there is no case where a state has sought to limit or restrict an FDA-approved medication. There is no action by a state seeking to do that other than this kind of situation that we're talking about here. The presumption simply doesn't apply. If you look at language in Locke and in Arizona v. United States, what the Supreme Court said was actually in those activities that have been exclusively federal, there is the opposite, which is that the presumption is that the federal government is supreme under the supremacy clause. But if a state should decide in its wisdom that a drug which was subject to the Remitz protocol is not a drug that is subject to the supremacy clause, then that's a presumption. But if a state should decide in its wisdom that a drug which was subject to the Remitz protocols would still be substantially unsafe for its own citizens to use, isn't it a real invasion of the state's police power to say that a state has no authority whatsoever to restrict its citizens' use to a drug or medication that the federal government has no authority to use? The federal government has already decided to be a sufficiently high-risk medication that required the Remitz protocols. No, that's actually an incorrect statement of the law, Judge Wilkinson. Where Congress entrusted the Secretary with doing that kind of balancing, where an expert agency that's got scientists and doctors and all kinds of protocols for ensuring safety, mandating clinical trials, enrolling people in clinical trials, that's not the case. Enrolling patients into post-marketing surveillance, all of these things are things that states never have done. Under those circumstances, Congress made the decision that we're going to have one uniform decision-maker because we want to affect the healthcare delivery system as a whole. So let's say we have a drug like OxyContin or some of the pharmaceuticals, some of the drugs that have been put out by pharmaceutical companies. Some of them produce great benefits, okay? But they also, together with those benefits, they carry substantial risks. And suppose, with respect to OxyContin or some federal drug, or some federally approved drug under certain circumstances, a state said, yes, we're going to have one uniform decision-maker. I understand that the federal government has approved this drug under a certain set of circumstances. But the safety and welfare of our citizens require that additional precautions be taken because we've seen what, by a dent of experience, the negative effects that OxyContin has, along with its positive benefits. And they're both. I would never say that something's wholly, you know, unbeneficial or whatever. But a state, wouldn't a state have the authority to add additional safety precautions to protect its citizens if they thought a particular pharmaceutical drug carried risks above and beyond what the federal government had decided? And even so, the federal government has not decided that this is a, oh, you know, happy-go-lucky kind of thing. The federal government has already made the decision that it is a medication of sufficiently high risk that a REMS protocol and conditions had to be imposed. And what I'm suggesting to you is that a state can look at it and say, look, we're hearing all kinds of reports in legislative hearings and elsewhere from people who have used these drugs, and they're too freely available. And we want, we appreciate what the federal government has done, but we want to add additional safety precautions of our own. And to say that a state can't do this, doesn't that just render, doesn't that really substantially impair the place of the states in our federal system? That's all I'm asking you. I'm saying the answer is absolutely not. And if I could answer you in a couple of different ways, Judge, to reassure you. Number one, at the general level, that position is wrong because states do not have the kinds of monitoring, evaluation, evaluation, and monitoring that we have. We don't have the kinds of clinical trials, all that kind of data that FDA takes in, and Congress knew that, and Congress has entrusted FDA with that decision. Number two, on OxyContin. OxyContin was regulated under the Controlled Substances Act long before the 2007 Act was implemented. I know, but I want to answer the question because I don't want you to leave this courtroom under any illusion that our position is anything but 100% correct. The Controlled Substances Act provided a dual sovereignty, so that for those drugs that were subject to the CSA, there was a role for the states in working cooperatively with the federal government, in some instances, to apply more restrictive controls because of the addictive nature of drugs that were on the Controlled Substances Act various lists. And so I don't think, Judge Wilkinson, with respect to your questions about general principles, that OxyContin was a dual sovereignty. You cannot decide this preemption case on the basis of larger principles where you have a specific statute to implement. This opioid crisis is ravaging the Ohio River Valley. It's ravaging upper New England. It is a brutal thing, and all I'm asking you is whether a state could not, in light of its experience, take a step back and say, well, this is what we're doing. And take some recognition of the risk of addiction, of a lifelong addiction. Of course. It would change somebody to this particular drug. And can't the states, could not a state act to reduce or mitigate the risk of addiction by enacting some additional conditions on access? Yes, under the Controlled Substances Act, there are provisions. Can it do that? Can a state do that? Yes. But this, Mifepristone is not subject to the Controlled Substances Act. It's not addictive. There is not a risk of an addiction or of a similar kind of crisis with opioids. No, I'm speaking of risk generally. I understand. But, Judge, I think it's important to take into account that West Virginia here did not do some safety analysis of Mifepristone before it enacted the UCPA. It enacted the UCPA without knowing what any of the science was. What other drug has Congress exercised, from the FDA, I guess, under RIMS, the same kind of oversight? Because there's a comprehensive oversight here as to who can prescribe the drug, how you can prescribe the drug. I mean, where it appears that Congress is pretty, or the FDA is pretty, about the use of Mifepristone. But it's not very descriptive in how this drug is supposed to be used, which is not under traditional, I guess, under the traditional realm of the FDA. We've given a few examples in our brief, and I struggled to pronounce them correctly. So for the drug makers out there listening, I apologize that I can't pronounce it. But we've talked about isotretinoin, which is a drug that is used in contraception circumstances. We've talked, you can look at Clozapine, Kaprelsa, Ambrosentin, Lanalidomide. There are roughly 70 of these drugs, and they have various restrictions on them for the circumstances. One drug, for instance, an acne medication, there is a REM so that you don't take that when you're pregnant. And because of the consequences that could happen, that very limited subcategory of medication, that very limited subcategory of potential users. And those restrictions are the ones that the FDA has imposed. But I want to point out that these REMs are, they are different for the different drugs, based on FDA's careful study of the science and the circumstances. Which the states have not done. Correct. And that's why, I guess, your argument is that there is this narrow group of drugs in which Congress has delegated to the FDA in terms of, for example, Mifepristone. For safety reasons and access reasons.  And for those reasons, your Honor, I think it's really important to approach the statute as a plain language textualist would. Which is to understand what was Congress trying to get at in the 2007 Act. The other side doesn't really take issue with our interpretation of the statute. They want to argue the case at very large, broad principles without looking at congressional intent. But preemption is a question of congressional intent. All right, we thank you. We wanted to give you some extra time. 21 days. We wanted to make sure you had a chance to get your case. Ms. Hawley, let's hear from you. Judge Wilkinson, and may it please the Court. My name is Erin Hawley, and I represent the state of West Virginia. According to GenBioPro, the 2007 amendments to the FDA radically altered the federal-state balance long set by Congress for drug regulation. You would agree that there's no savings clause in the 2007 amendments? I would not agree, your Honor. The court in Wyeth, as my esteemed counsel said in the Merck case, the court in Wyeth interpreted that clause broadly. What Congress was doing in 1962 was looking at the drug regulation. It was looking at the traditional trajectory of state and federal regulation. And as the court said in Wyeth, Congress since 1906 has always sought to preserve state authority. In enhancing authority in those 1962 amendments, Congress said, we want to make it crystal clear. We are not in any way intruding upon the state's traditional authority to regulate the practice of medicine. So that clause does apply to the... But it's not in the 2007 amendments? No, but I believe it applies to it, your Honor. So to continue, GenBioPro says that the FDAAA sets a federal ceiling in addition to the traditional federal floor and boots states from their traditional prerogative to regulate the practice of medicine. What kind of practice of medicine are you pointing to that the states have had traditional authority to regulate? What examples do you have? Absolutely, your Honor. I would point you to the case of West Virginia v. Dent. A case from the late 1800s in which the United States Supreme Court clarified way back in the day that states are entitled and have the authority to regulate medical licensure. That's just one example. Your Honor mentioned opioids. But medical licensure is not medicine. You're saying, citing a case from the 1800s that deals with... I would agree with you that states have the authority to deal with whether a doctor has a license, whether a nurse has a license, but we're talking about the regulation of the medication here. So, your Honor, I would cite you to something called FDA FACTS. It has public question and answer. And the question the FDA poses there is, does FDA regulate the practice of medicine? And the answer is no. The FDA has never taken the position that it regulates the practice of medicine. It also goes on to state that the FDA does not regulate accessibility of drugs. That is a traditional understanding of the FDCA. It's a traditional understanding of the Supreme Court. I would also point, your Honor, to JA 87 and 88. At that page, we cite to the FDA's cue and answers regarding Mifeprestone. And what the FDA says to healthcare practitioners is, if you want to know whether you can prescribe this, quote, check your individual state laws. The FDA itself acknowledges what has always been true under the FDCA, and that is that states get to practice medicine. They get to regulate the healthcare field. They get to, as Judge Wilkinson was pointing out, set additional regulations on really high-risk drugs like opioids. What if the state decided to... Excuse me, what if the FDA decided to regulate a cancer drug? My web example, I asked your colleague a question using hypothetical. Decided it wanted to regulate a cancer drug. And suppose that a state, I'm not going to pick on West Virginia, decided that it wanted to not allow this drug to be used because it used stem cells. Could a state do that? So I think that's a more difficult question, your Honor. But I do think it brings up something really important with respect to filled preemption. So filled preemption doesn't exist here for two reasons. One, as this Court said in Johnson v. American Towers, where you have a savings clause, fundamentally filled preemption cannot exist. But second, and to your point, Judge Alston, that when Congress and the states regulate in separate fields, the Supreme Court has been clear that that's okay. So the case that controls this one is called Virginia Uranium. And in that case, Virginia was regulating mining. The federal governments had exclusive, comprehensive regulations of milling. And what the Court held, and what Justice Ginsburg said in her concurrence, was that where a state is regulating an upstream activity, like West Virginia is doing with Mifeprestone, or excuse me, with abortion, then the fact that something, even if it were to fall into a federal enclave, which it doesn't here, then that would be different because they're different fields. So this case fails filled preemption for several reasons. Again, there's a savings clause. In addition, they're regulating different fields. GenBioPro is not even regulated by the UCPA. Suppose the Congress were to say, were to mandate access to this particular pill. You would have no problem with that if Congress were to mandate access, would you? I don't believe so, Your Honor. That's absolutely not this case. I'm asking you, does Congress have the power to mandate access to this particular pill and to preempt any state from restricting it if it wanted to? Because I'm interested in what the powers of Congress in this area are. Sure, so as Your Honor noted, Dobbs returned the power to regulate the matter of abortion to the states, to the elected representatives. So there might be an argument that Congress, if through its democratically enacted branches, sets limits on abortion as they have in the Partial Birth Act, then that's permissible. I think it's a harder question whether Congress itself can regulate or require nationwide abortion access. Of course, in Bernie v. Flores, the Supreme Court said that the Section 5 powers can't go above and beyond the right recognized by Congress, excuse me, yes, by the Supreme Court. What enumerated power it would link up to? Yes, and under Bernie v. Flores, there must be an identified Supreme Court right. Did Congress come pretty close to mandating access when there's statutory language that says the conditions that are imposed pursuant to Remy's shall not unduly inconvenience or burden any patient? I mean, what I'm asking is, even though Congress didn't flatly mandate access with the language that patient access should not be unduly burdened or patient should not be, well, unduly burdened, isn't that coming close to mandating access? Not at all, Your Honor. Let's look at the statutory text together. My friend on the other side, he uses a lot of ellipses when he quotes West Virginia statutes as well as the FDCA here. And what it says is 355.1.F.2. And the district court was right to focus on this. And it says, such elements to assure safe use under paragraph 1. So what Judge Chambers found correctly was that such elements to assure safe use under paragraph 1 is a clear indication that the only entity, the secretary, as my friend noted, the only entity that needs to consider access is the FDA. There is no indication anywhere in the FDAAA that Congress intended to displace states from their traditional authority. Again, to look back to the Wyeth case, Your Honor, the court found persuasive that Congress knows how to preempt state law when it wants to. It did so in the 1976 medical device amendments. And it also did so in the FDAAA. But with respect to the conditions that were put on use and with respect to the REMS protocols, didn't those proceed under a presumption? Maybe it's an implied presumption, but didn't those use the safety use features proceed under at least an implied presumption that access to the medication or the pill would be provided? I don't think so, Your Honor, because the status quo was that these drugs wouldn't be on the market. They're high risk. They are associated... Why wouldn't it be... What would be the reasons to enact the safe use provisions unless there was a presupposition that access would be provided in order to use them? I mean, the safety use provisions assume that access would be provided, don't they? No, Your Honor. And the reason being is that the FDCA writ large has never been interpreted to require access. It's never made GenBioPro sell a single drug, much less at an affordable price. There is no emphasis on access. Rather, what Congress was doing with the FDAAA is making sure that really high-risk drugs were subject to sufficient protocols. Would we be the first court... I'm always concerned about circuit conflicts. Would we be the first court in the United States to mandate access or to find that this statute mandated access to the extent of preempting states to limit it? Would we be the first court to do that? Yes, you would, Your Honor. In fact, GenBioPro originally filed suit in the Fifth Circuit but voluntarily dismissed. So this court is the first court to consider this question. Okay, so you're saying that there's no district court anywhere that is mandated access? No, Your Honor, not under a statute like this. So Judge Chambers had it correct when he looked at Section 355.1. He said that was, quote, plainly directed only to the FDA. If we were to be the first court to take this step of a mandating access which you say is unprecedented, is that because other courts have rejected the idea of mandating access or is it just because insufficient cases have been brought and there have been scant, few if any, rulings? Why would we be the first court to do this? Is it because there's a paucity of other cases out there or because the courts that have taken up the question agree with your perspective? So I think it's both, Your Honor, with Judge Chambers' decision below agreeing with us. But I think there's a reason that there's a paucity of cases is precisely because no one, including the FDA, has ever thought that Congress in 2007 was mandating nationwide abortion access. Instead, the 2007 amendments, they were passed by a bipartisan Congress, unanimously waived through the Senate. All but a few House members voted for these 2007 amendments. And to get back to that, that keystone, that touchstone of Congressional intent, one of the Supreme Court's key inquiries is the context of the statute and what else the statute says. Here, Your Honor, if I could point you to 121 Statute 922. This is in the FDAAA. It's 801D and it's entitled Preemption. And what Congress does in this narrow provision is it preempts, it says no state shall enact any requirement on the registration of clinical trials. That's in the FDAAA. That shows that Congress plainly knows how to preempt state law when it wants to. It did not do so in this case. So is your view that with highly controversial questions, which this one is, we would all agree, that that requires a crystal clear expression of intent from the national legislative branch in order to displace state authority in the area? I think that's correct, Your Honor. It's correct under the presumption against preemption because we are talking about traditional state regulating the medical, health, and safety field. It would be true under field preemption, which requires a clear and manifest intent from Congress to preempt a field. Beyond some sort of sliding scale that the more controversial and volatile a question is, the clearer the expression from Congress must be? I don't think so, Your Honor. There is the major questions doctrine, which I haven't talked on yet. And I think, or I haven't touched on it, I think Jen Biopro's view of the FTAAA would implicate the major questions doctrine. Counsel, again, was forthright. With the comprehensive nature of the regulation, the way that they leave no room for the states directly or indirectly. Because it's so comprehensive under this reams, he says, of 70 drugs, I'm just trying to figure out how because as I asked him earlier about it's comprehensive. It tells you who can take it, how you take it, how the doctors are supposed to. More oversight than any other drug. Does that comprehensive nature leave no direct or indirect room for the states? No, Your Honor. And I think Jen Biopro vastly overstates what the reams do. Its own the reams are limited. And invited states to regulate alongside. If you look again at FDA's question answers, it says it does not regulate the practice of medicine. It instructs the FDA's Q&A for Mifeprestone, instructs state healthcare providers to, quote, look to their individual state laws to see who may dispense the drug. It's simply not correct that the FTAAA regulates drugs like opioids, like Mifeprestone end to end. Congress has never asserted that sort of authority over the practice of medicine. And that would require some sort of clear statement, some congressional intent in the statute. But instead, we agree with Judge Chambers that every indication is that Congress meant to save state laws like the UCP at issue here. He said that Section 355.1 was, quote, plainly directed only to the FDA. And not, didn't boot states from their traditional authority. I also wanted to take just a... What if a state did something that was absolutely incongruent with the FDAA mandate? What would be your suggestion there? So in that perspective, Your Honor, I think we would be dealing with purposes and objectives preemption. Field preemption doesn't exist. It could be a case of impossibility preemption. With impossibility preemption, it's a demanding standard. It says that in federal law might require something and a state law might forbid it. So if that was your hypothetical, then that would be preempted by impossibility preemption. The third bucket of preemption cases are those involving sort of purposes and objectives preemption. Now that, of course, is the bucket of preemption that the Supreme Court has been cautious about. So there is preemption here to an extent. In other words, the... I guess I'm just figuring out, trying to figure out the position is that the states are free to add additional protections, but the states are not free to subtract. I mean, if suppose a state wanted to say that the REM safety protocols, for example, are no longer operative or such and such and such and such of the REM safety protocols, this certification is no longer operative. And they were subtracting from the safeguards that Congress provided. That would be preempted, would it not? Subtraction? Absolutely right, Your Honor. Under obstacle preemption, that would be contrary to the purpose of Congress to make sure that these high-risk drugs are safe. We are talking about... Your position is you're not depriving the statute of preemptive effect. You're simply saying the statute does have preemptive effect in the sense that the states cannot relax or reduce safety conditions, but the states can add additional safety measures. So it's sort of a question of floor and ceiling, isn't it? Absolutely, Your Honor. So if a state tried to take away one of those crucial safeguards for a drug, that would run directly into obstacle preemption. And the FDCA's mandate to ensure that these drugs are safe. So you could have impossibility preemption, you could have obstacle preemption in those sorts of circumstances. Why would Congress and why would the FDA go into all of this detail, all of this voluminous detail, if it did not intend to preempt? I mean, this is not something that they just sort of waved a wand over. They looked at this issue. They addressed it in the most meticulous way possible. So why isn't that an important issue of Congressional intent? So I think that would go to the field preemption bucket, which I think doesn't work because of the savings clause and because they don't regulate the same fields. But even putting those aside, Your Honor, the reason there is detail in this statute is because Congress and the FDA are dealing with the most dangerous, the highest risk drugs on the market, which are associated with severe, adverse, or serious is the statutory language, adverse consequences. So FDA is taking precautions, post-marketing precautions to ensure the safety of individuals who use those. So you're saying that the scheme you're proposing preserves rather than eviscerates an important role for the FDA? Absolutely, Your Honor. The role of the FDA here is to make sure that the drugs it approves... You're saying, and just to make your position, to make sure I understand what the respective positions are, you're not seeking to put the FDA out of business? Not at all, Your Honor. We are, I think... This is not a full-scale assault on the administrative state or anything like it. It's, say, the FDA retains an important role and the states are not free to relax the safety protocols that the FDA has implemented. That's absolutely correct, Your Honor, and that's been the FDCA, Congress' intent in the FDCA since 1906, that states come along and supplement. They add to but don't take away from those federal protections. And I wanted to take just a minute to talk about the sort of odd statute that would exist if GenBioPro were correct. So as Your Honors have noted, things like opioids, there's no way to distinguish opioids from mifeprestone. The fact that another statute, the Controlled Substance Act, also governs opioids isn't a reason to say that a separate statute, the FDAAA, doesn't have the effect GenBioPro says it otherwise does. So opioids are subject to the same restrictions as mifeprestone. If opioids, if mifeprestone can't have additional safeguards, then neither can opioids. The second oddity with GenBioPro's position, Your Honor, is brought to light by the Supreme Court's decision in Wyeth. And there my esteemed counsel on the other side persuaded the Supreme Court that one reason that state regulation was important was because the FDCA doesn't have remedies. That means if an individual is injured by an unsafe drug, there's nothing they can do under the FDCA. Instead, according to Wyeth, what Congress determined was that state tort law would come alongside and support and provide that cause of action. Under Bartlett, this is at 491, there's no distinction for preemption purposes between common law causes of action and state regulation. That's been true since Judge Calabrese's Windows from the Cathedral. Both impose duties and obligations and there's no way to carve out common law causes of action. And then third and finally, Your Honor, is that in the Eastern District of West Virginia, 12 Attorney Generals have sued FDA saying that the Mifepristone rims are too intense, that they should just be taken away, that the drug is super safe despite the FDA's own label. Now if that were to happen, if the court or the FDA were someday to withdraw its rims restrictions under GenBioPro's view that these rims are different then state laws protecting life would suddenly spring back into being. That can't possibly be what Congress intended in 2007. Let me ask my colleagues if they have further questions of you. Judge Benjamin, do you have some further questions? We thank you very much. Thank you, Your Honor. Mr. Frederick, you have some rebuttal time. Thank you, Your Honors. I want to start with the idea that the FDA supposedly erases state's police power. It does not. What it says is that the states have a role with respect to the subject matter of unborn life, but they can only exercise it outside the idea of where the FDA has given that power to the federal agency. So surgical abortion, our case is not about that. Our case is not about Mifepristone outside the 10 weeks specifically prescribed by the FDA for its safe use. And so to go beyond that and assert that our argument is broader than that is not correct. Judge Wilkinson, you asked whether this would be the first case to uphold access. You also, if you were to rule on their side, be the first case in the history of the United States, the first court of appeals to hold that a state can restrict access to an FDA-approved drug, and not just an FDA REMS drug, but an FDA drug of any kind. No court has upheld a state restriction of the type that West Virginia is asserting here. There is no safety rationale behind the UCPA. Don't we really get down to how DOPS sort of affects this whole inquiry? Because whether you agree with it or not, the bottom line is that the Supreme Court seems to suggest generally that these types of questions on abortion, and that gets people all fired up about it either way, and that's understandable, should be best left to the states. And because we live in the United States of America, if you want to access certain things, you can move to a state that allows it. If you don't want to have access, you live in a state that doesn't. In other words, it allows individuals to citizenry to make their determinations based upon what is best for them. With respect to surgical abortions, I agree with you. With respect to medication abortions, Congress disagrees with you. Because Congress enacted a comprehensive scheme in the 2007 Act to ensure that the FDA would balance access to a drug with all the other restrictions that would be necessary while keeping in mind rural areas, regardless of what state, the healthcare delivery system, regardless of what state, the procurement of drugs, and the national delivery system with respect to medical devices and issues without regard to states. And so DOPS addressed the question of the individual constitutional right. It did not address the statutory question we have presented here, which is whether Congress has an intent to preempt an effort to encroach on either the subfield of these REMS drugs with safe use elements or to conflict with the decisions that Congress has made. Now, the other side boils its argument down to this proposition. Congress did not What Congress did was it entrusted the FDA to balance allowing and providing access with these other safe use elements. And so they don't question that their position actually second guesses that. I'm going to ask you the same question I asked your opponent colleague, and that is, could the FDA decide that it wanted to prescribe the use of stem cells? Suppose we had a FDA and they made that determination. Could they do that? Well, I don't think that the question of how research is done for drugs is actually directly regulated under the FDAAA. And so the way you would answer the question, Judge Olson, and I don't have a clear answer for you that would be satisfactory, is that clinical trial research and the research that or at pharma labs. And they come up with their own protocols for designing the drugs and using the available materials for them and constructing those drugs. How that is regulated is not an area that I have expertise or knowledge about. But what I would say is that you would look at those scientific protocols that are done like under National Science Foundation grants, authorities under National Institutes of Health, et cetera, and you would evaluate the conflict preemption question the very same way we're doing here. What did Congress say and how does that dovetail with what a state might seek to do? And you analyze that preemption question always on the basis of congressional intent. And so when the other side says that there is an opportunity for states to go no, 355-1D provides a mechanism for interested people to petition FDA and say we want the federal standard to be more strict or we want it to be looser. And the states can do that, citizens can do that, interested parties can do that, and that is how this is traditionally done and regulated and Congress provided for that. But then when Congress said we want the secretary to make the decision, it prescribed that in 355-1. And I note that my friend on the other side has not defended the proposition that her position leads to 51 different regimes, I'm counting the 50 states in the District of Columbia, and Puerto Rico, call it 52, call Guam, whatever. What I'm saying is that when Congress said for the FDA to enact a system for the healthcare delivery system, it was intending to create uniformity. And under classic obstacle preemption principles, the West Virginia statute leads to an obstacle preemption nightmare for an FDA that is entrusted with implementing and promulgating this statute. Thank you, Mr. Frederick. We appreciate it. Ms. Hawley, we appreciate it. We thank you both for your arguments. We will adjourn court and come down and greet counsel. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, DeAndrea Gist Benjamin, Rossie David Alston Jr.